UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

THOAI NGUYEN, ET AL.                    CIVIL ACTION

VERSUS                                  NO: 24-518

JP MORGAN CHASE, N.A., ET AL.           SECTION: "A" (2)

**ORDER AND REASONS**

The following motion is before the Court: **Motion to Dismiss (Rec. Doc. 19)** filed by the defendants, JPMorgan Chase Bank, N.A. ("Chase") and the Federal National Mortgage Association ("Fannie Mae"). The plaintiffs, Thoai Nguyen and Vladimir Thomas, have filed a response in opposition to the motion. The motion, submitted for consideration on June 26, 2024, is before the Court on the briefs without oral argument. For the reasons that follow, the motion is granted in part and denied in part.[1]

I.      **Background**

On March 24, 2008, Vladimir Thomas executed a promissory note in the principal amount of $141,200.00 with Chase. The indebtedness was secured by a mortgage on the plaintiffs' principal dwelling located in Marrero, Louisiana. The loan was sold to

---

[1] In 2018 Vladimir Thomas was one of twenty-five students who participated in this Court's summer program, which is an observational internship program. The Court's records reflect that Mr. Thomas attended five observational sessions that summer, and two additional observational sessions after the summer session concluded. Students who participate in the program are not given work assignments and they do not work alongside the Court's staff in chambers.

Fannie Mae on May 1, 2008 but Chase remained the loan servicer.[2] The note specifically allowed the borrower to make prepayments of principal without penalty. (Rec. Doc. 1-2, Redacted Note). The plaintiffs allege that in addition to the mandatory periodic monthly payments of principal and interest required by the loan agreement, they made "extra periodic payments and additional principal payments." (Complaint ¶ 2). The plaintiffs contend that Chase either grossly misapplied or failed to credit some of their payments over the course of several years since the loan's inception. The alleged failure by Chase to properly credit the additional principal payments, and the handling by Chase of Thomas's inquiries regarding those extra payments, constitute a significant part of this lawsuit. According to the plaintiffs, failing to properly apply prepaid principal payments to the loan balance, affects the duration of the loan term and the amount allocated to the interest and periodic principal each month, thus allowing Chase and Fannie Mae to unlawfully maintain an interest in the secured property and collect unearned interest and principal.[3] (Complaint ¶ 20).

---

[2] Chase is a federally-insured financial institution. Fannie Mae is a government-sponsored entity that buys and guarantees mortgages through a secondary mortgage market. (Rec. Doc. 1, Complaint ¶¶ 13 & 14).

[3] Throughout this Order and Reasons the Court refers to Thomas individually as well as to "the plaintiffs" collectively, so a point of clarification is necessary. This lawsuit was brought by both Thoai Nguyen and Vladimir Thomas, who are co-plaintiffs on all of the claims. But the loan documents and all of the statements pertaining to the home loan are in the name of Vladimir Thomas alone. None of the 26 exhibits that have been attached to the complaint include Ms. Nguyen as a signatory or party. Ms. Nguyen may very well have an interest in the property subject to the mortgage that secures the loan (the complaint does not include allegations to establish that), but that would not necessarily mean that she has legal standing (federal claims) or a right of action (state law claims) to sue the defendants under the legal theories asserted. As yet, the defendants have not challenged Ms. Nguyen's standing as a

The complaint comprises 37 pages with 149 paragraphs and 89 footnotes that detail events that date back as far as 2009. But at some point in 2020 Thomas began to dispute Chase's application of payments on his loan. Thomas did so through Chase's electronic communication portal. In August 2020, in response to an email/message sent by Thomas to Chase, a Chase representative advised that the total amount of principal paid on the loan since 2008 was $47,166.63. (Exhibit 13, Rec. Doc. 1-14 at 1). The representative attempted to clarify an issue regarding how monthly statements are generated. The representative also advised that the loan was setup to allow for 2 months-worth of prepayments; only when the loan is already paid ahead for 2 months will additional payments be applied to principal only. (Exhibit 13, Rec. Doc. 1-14 at 1). The plaintiffs complain that this arrangement was not part of the 2008 loan agreement and that they didn't know about it or agree to it and that Chase deceptively and unlawfully began adding notice of this procedure to the mortgage statements in December 2018—prior to that and going back to March 2008 that language was not part of the mortgage statements.[4] (Complaint ¶ 37).

---

plaintiff.

[4] In addition to the potential standing problem noted in footnote 3 above, the Court has noted another potential standing problem in this case. To have standing to sue in federal court, a plaintiff must show that he has suffered an injury-in-fact that is "fairly traceable" to the defendant's conduct. *Deanda v. Becerra*, 96 F.4th 750, 755–56 (5th Cir. 2024) (citing *Laufer v. Mann Hosp., L.L.C.*, 996 F.3d 269, 272 (5th Cir. 2021)); *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409 (2013). The plaintiff must make this showing for each claim being made and for each form of relief being sought. *Perez v. McCreary, Veselka, Bragg & Allen, P.C.,* 45 F.4th 816, 821 (5th Cir. 2022) (quoting *TransUnion, LLC v. Ramirez,* 594 U.S. 413, 431 (2021)). Article III standing goes to subject matter jurisdiction so it is necessary to all claims being brought in a federal court, even those claims brought pursuant to state law.

The plaintiffs allege that in December 2020, they made additional principal payments totaling $24,334.44 in that month alone, which based on the Chase report contained in Exhibit 9 to the complaint, indicated to them that the payments had been applied to the remaining principal balance. (Complaint ¶ 27). In December 2020, Thomas informed Chase that the extra December 2020 payments were to be applied to principal only and not to be applied to the succeeding months' periodic payments and interest. (*Id.* at ¶ 27). A Chase representative identified only as "Amparo" responded electronically that Thomas could not make advanced principal payments because advanced payments could only be made if the account was current and no fees were due. (Exhibit 11, Rec. Doc. 1-12 at 4). The representative stated that Thomas's account "is due for March 1, 2020," and that the loan was currently under a protection plan. (*Id.*). As it turns out, nearly all of the information that "Amparo" provided to Thomas was incorrect. After several requests by Chase for additional time to investigate, a Chase Escalations Specialist got involved and responded on January 12, 2021, that upon further review the account was in fact paid ahead and that no late fees were due. (*Id.* at 9). Chase later acknowledged the blatantly incorrect and erroneous information that "Amparo" had given Thomas regarding the status of his loan account. (*Id.* at 20). The plaintiffs rely on the fact

---

So for example, the plaintiffs dispute the accuracy of the Chase representative's explanation regarding how statements are generated. (Complaint ¶ 35). Even assuming that the representative provided an incorrect answer, it is difficult to imagine how this would have caused the plaintiffs an injury-in-fact "fairly traceable" to the representative's incorrect answer. The defendants have not expressly challenged jurisdictional Article III standing but they have hit at it indirectly by challenging those causes of action that require actual damages as an element.

that the foregoing "false, manipulated, and misleading information" was communicated to Thomas electronically through the Chase online account messaging system, *i.e.*, "by wire," (Complaint ¶ 31), when attempting to lay a foundation for a criminal predicate act (wire fraud) to support a RICO claim.

After all of that, and notwithstanding assurances on February 4, 2021 by the Chase Escalations Specialist that the additional principal payments had been properly applied as additional principal payments, (Exhibit 11, Rec. doc. 1-12 at 19), it was on April 26, 2021, that the plaintiffs discovered via the Chase electronic mobile system that the additional principal payments made from July 2020 through April 26, 2021, including the payments from December 2020, were designated in the Chase system as "UNAPPLIED." (Complaint ¶ 27). When the plaintiffs re-ran the inquiry in February 2022, it indicated going back to February 2019 that the additional principal payments were "UNAPPLIED."[5] (*Id.*). The plaintiffs complain that there have been numerous instances since the inception of the loan where payments were made but never properly applied thus causing late fees to accrue. (Complaint ¶ 34, Exhibit 4).

The plaintiffs also discovered that Chase had provided incomplete information to credit agencies regarding the mortgage account. Thomas's credit report from December 3, 2022 had no entries for all of 2020 except for the month of December and the duration for the mortgage loan was reported as 36 months. (Exhibit 12, Rec. Doc. 1-13). Thomas also complains that in 2021 and 2022 Chase similarly reported to the credit bureaus

---

[5] The Chase system only reports 24 months of historical transactions hence the two-year timeframes in the reporting. (Complaint at 8 n. 20).

erratic and discontinuous payments.[6] (Complaint ¶ 33).

On January 11, 2023, the plaintiffs obtained an online loan report through the Chase system that reported that $15,706.22 in principal was still owed when in fact the system should have reflected that the loan had already been paid off. (*Id.* ¶ 15). The online report reflected prepaid principal of $86,172.23, with a total principal paid amount of $125,493.78, the difference of which is $39,321.55, which would be the amount attributable to the total periodic principal paid. Given that the original amortization schedule for the loan reflected that the cumulative periodic principal as of January 11, 2023 would be $39,320.24, which is awfully close to $39,321.55, Thomas knew that Chase had failed to apply the prepaid principal payments to the loan balance. (*Id.* ¶ 20).

On that same day, January 11, 2023, Thomas notified Chase through its electronic internal messaging system to advise that the figures reporting in the online system were incorrect, and "the [loan] should be paid off by now." The message concludes with a request to "[p]lease provide complete accounting and entire records of all accounts." (Exhibit 2, Rec. Doc. 1-3 at 5).

Chase responded the same day by forwarding certain documents and including a narrative that the plaintiffs characterize as a confirmation that the loan had in fact been

---

[6] Thomas has not alleged any damages resulting from the incomplete information provided to the credit bureaus, *i.e.*, that he attempted to obtain credit but was either denied credit or offered credit on less favorable terms. *Spokeo, Inc. v. Robins,* 578 U.S. 330, 342 (2016) (noting that not all inaccuracies in the information maintained by a consumer reporting agency cause harm). This is another example of an Article III standing problem based on the absence of an injury-in-fact.

paid off.[7] (Complaint ¶ 17; Exhibit 2, Rec. Doc. 1-3 at 8). The plaintiffs were able to determine based on the historical transactions contained in the documents sent by Chase that the actual amount of prepaid principal paid to date ($70,646.44) and the actual amount of periodic principal paid to date ($54,847.34) did not match the numbers being reported on the January 11, 2023 online loan report from the Chase system.[8] But the total amount of principal paid ($125,493.78) based on the historical transactions exactly matched the number being reported on the online loan report from the Chase system. (*Id.* ¶ 18).

The plaintiffs rely on the fact that the foregoing "false, discrepant, and manipulated statements and amounts as presented by the online account, historical transactions, and Chase's responses" were communicated to Thomas electronically through the Chase online account messaging system, *i.e.*, "by wire," and the mail, (Complaint ¶ 22), when attempting to lay a foundation for a criminal predicate act (wire fraud and mail fraud) to support a RICO claim.

_____

[7] Whether the loan is actually paid off is in dispute. Chase's position, at least as of August 9, 2023, was that the loan was *not* paid off and the remaining principal balance as of that date was $15,706.22. (Exhibit 15). The Court has been unable to glean from the plaintiffs' papers exactly when they believe that the loan was actually paid off, or exactly how the reconciliation provided in defense counsel's letter of August 9, 2023, which explains why the remaining principal balance is $15,706.22, is incorrect.

Furthermore, the plaintiffs' characterization of the January 11, 2023 communication from "Lux" with Chase (quoted in paragraph 17 of the complaint) as one confirming that the loan had in fact been paid off embellishes mightily what the representative communicated to Thomas. The narrative is poorly written to say the least but it does not include a clear confirmation or concession that the loan was paid off.

[8] The $54,847.34 total amount for periodic principal paid to date (through January 2023) is also substantiated by the "reconciliation statement" contained in Exhibit 4. (Complaint ¶ 21).

On March 6, 2023, Chase advised Thomas in writing that no errors had been found in the application of payments. (Exhibit 13, Rec. Doc. 1-14 at 3).

A few months later at some point prior to this lawsuit being filed, defense counsel for Chase began a dialog with Thomas, who is also an attorney. On August 9, 2023, defense counsel sent a letter to Thomas explaining that he had reviewed the entire file relating to the mortgage loan going back to 2008 to determine whether in fact any balance was owed on the loan, and to review the application of the additional payments made toward the principal balance over the life of the loan. (Exhibit 15, Rec. Doc. 1-16). Defense counsel's letter identified each additional payment made (identifying the payment date and amount) going back to July 4, 2009, and he provided to Thomas the bank documents, specifically the payment history that showed the various payments. Counsel advised Thomas that as of that writing all of the principal payments had been accounted for and properly applied but that the loan was "not quite fully paid off," with a remaining balance of $15,706.22.[9] (*Id.* at 2). This is the same amount reported in the Chase online system on January 11, 2023. (Complaint ¶ 15).

The plaintiffs studied the bank documents produced to Thomas through counsel on August 9, 2023, and noted transactions that they did not know about, including what they believe to be an erroneous or fraudulent escrow disbursement toward a homeowner's insurance policy that occurred in July 2009. (Complaint ¶ 39). In fact, the plaintiffs noted several issues surrounding payments in July 2009 and possibly other

---

[9] This letter from defense counsel is referenced in footnote 7 above where the Court explains Chase's position on the status of the loan.

duplicate transactions. (Complaint ¶ 39 & 42). The plaintiffs allege that the bank documents confirm that Chase misapplied numerous payment transactions on the mortgage account beginning in July 2009. From that point forward, Chase failed to promptly apply the additional principal payment transactions on the date of receipt to reduce the principal balance, instead applying them at a later date, thus allowing Chase and Fannie Mae to collect and gain unearned interest and principal. (Complaint ¶ 39). The plaintiffs allege that there are 28 or 56 instances of misapplication which clearly affect the principal balance and interest in a manner that benefits Chase and Fannie Mae so as to collect unearned principal and interest. (Complaint ¶ 45). And reviewing the bank documents produced by defense counsel on August 9, 2023, revealed numerous instances where the information reported in Chase's electronic mobile system was either incomplete or inaccurate. (Complaint ¶ 46).

The plaintiffs also allege that Thomas sent three Qualified Written Requests ("QWR"), which is a legal term defined under federal law—the plaintiffs label the requests as QWR1, QWR2, and QWR3—to Chase but that the responses to QWR1, QWR2, and QWR3 were deficient or incomplete or otherwise noncompliant with legal mandates. (Complaint ¶¶ 47-61). The plaintiffs allege that it was in response to their QWR2, sent on January 24, 2023, that they learned that Chase had sold the loan to Fannie Mae on May 1, 2008. (*Id.* ¶ 57). Neither Chase nor Fannie Mae had notified them of the transfer before.[10]

---

[10] Fannie Mae points out that the requirement that a new owner of a debt notify the borrower

The plaintiffs go on to allege irregularities with the manner in which Chase managed the escrow account. Plaintiffs complain that Chase varied the escrow review period throughout the duration of the loan for no good reason. (Complaint ¶ 62). At times Chase would imbed a mortgage due date with the escrow analysis statement. (*Id.* ¶ 63). There were discrepancies between the information reported in the escrow analysis statement and the online mortgage escrow account details. (*Id.* ¶ 64). The plaintiffs allege that Chase at times conducted the escrow analysis before the end of the escrow period which caused the escrow account to reflect a shortage. (*Id.* at 65). Chase also willfully omitted escrow deposits from its escrow analysis causing the escrow account to be short. (*Id.* ¶ 66). From September 2020 through February 2021 Chase falsely stated in its final escrow analysis statement of February 13, 2021, that $0.00 was deposited into the escrow account during that time period when in fact $309.87 was deposited each month. (Complaint ¶ 69). When the account had a surplus Chase repeatedly failed to refund any escrow surplus in excess of $50.00. (Complaint ¶ 65).

---

of the sale only became effective after Thomas's loan was sold. (Rec. Doc. 26, Reply at 6). As to both Chase and Fannie Mae, the plaintiffs have not alleged any injury traceable to the failure to inform them that the loan had been sold to Fannie Mae. Importantly, even if the failure to notify were to constitute a statutory violation, Supreme Court precedent drives home the point that statutory standing and constitutionally-required Article III standing are distinct, and that having the former does not necessarily mean that the plaintiff satisfies the latter; a plaintiff does not automatically satisfy Article III's injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. *Spokeo*, 578 U.S. at 341; *TransUnion*, 594 U.S. at 426-27. Article III standing requires a concrete injury even in the context of a statutory violation, *Spokeo*, 578 U.S. at 341, because under Article III an injury in law is not an injury-in-fact, *TransUnion*, 594 U.S. at 427. A plaintiff cannot allege a "bare procedural violation" of a statute "divorced from any concrete harm" and hope to satisfy the injury in fact requirement of Article III. *TransUnion*, 594 U.S. at 440 (quoting *Spokeo*, 578 U.S. at 341).

Furthermore, the plaintiffs noticed two questionable withdrawals from the escrow account. On April 24, 2015, Chase disbursed $1.00 from the account toward a fictitious homeowner's policy. (*Id.* ¶ 67). On June 24, 2020, Chase disbursed $2,004.00 from the escrow account for a duplicate insurance disbursement even though Chase knew that the property was insured. (*Id.* ¶ 68).

In a section of their complaint entitled False Statements and Additional Deceptive Practices, the plaintiffs complain at length about the manner in which Chase organized the information on the monthly mortgage statements that Chase issued in conjunction with the loan account. According to the plaintiffs Chase was using deceptive and abusive acts and practices to conflate the terms and meanings and conceal the true accounting and progress of the mortgage loan. (*Id.* ¶ 70). Then from February 2020 through June 2022 Chase falsely reported the loan start date as March 2008 but then changed it to May 2008 beginning in July 2022. (*Id.* ¶¶ 77 & 78). Chase made it difficult for the plaintiffs to determine the new estimated loan end date in light of the additional principal payments that they had made. (*Id.* ¶ 77).

Thomas complains that Chase never provided the original amortization schedule when the loan closed in 2008. (Complaint ¶ 79). Chase informed the plaintiffs that they had enrolled in paperless statements on November 9, 2010, but that this was cancelled on July 21, 2021 but the plaintiffs actually enrolled in paperless statements in June 2013 but then cancelled that in July 2020. (*Id.* ¶ 80). When the plaintiffs sent inquiries to Chase about the paperless enrollment and pressed for records, Chase began

retroactively encrypting the earlier paperless statements. (*Id.* ¶ 82).

The plaintiffs' experiences with Chase in conjunction with the home loan that Thomas obtained in 2008 have persuaded them that Chase has purloined, misappropriated, and intentionally misapplied credits and funds, while making false entries in records and making false statements. (Complaint ¶ 41). The plaintiffs contend that Chase and Fannie Mae have fraudulently misappropriated their money through mail fraud, wire fraud, bank fraud, and money laundering.

The plaintiffs have brought a multitude of causes of action against Chase and Fannie Mae under the Real Estate Settlement Procedures Act (RESPA), the Truth in Lending Act (TILA), the Fair Debt Collection Practices Act (FDCPA) (Count I), the Racketeer Influenced and Corrupt Organizations Act (RICO) (Count II), the Louisiana Racketeering Act (LRA) (Count III), Annulment (Count IV), Breach of Contract (Count V), and Unjust Enrichment (Count VIII). Against Chase alone, the plaintiffs bring causes of action under Fraud (Count VI) and Breach of Fiduciary Duty (Count VII).[11]

Chase characterizes its interactions with the plaintiffs as a simple payment dispute that escalated into this lawsuit. Chase and Fannie Mae now move to dismiss the plaintiffs' complaint in its entirety with prejudice arguing that none of the claims has merit, some border on the absurd, and that notwithstanding their exhaustive complaint the plaintiffs have failed to state any valid claims for relief.

The question before the Court therefore is whether the multitude of plaintiffs'

---

[11] The plaintiffs' complaint includes a Count IX entitled Injunctive Relief, which is not a separate cause of action but rather a form of judicial relief.

allegations support any of the causes of action included in the complaint.[12]

The parties' competing contentions are addressed below.

## II.   Discussion

The central issue in a Rule 12(b)(6) motion to dismiss is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief. *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (quoting *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)). To avoid dismissal, a plaintiff must plead sufficient facts to "state a claim for relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Id.* (quoting *Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)). Legal conclusions must be supported by factual allegations. *Id.* (quoting *Iqbal*, 129 S. Ct. at 1950).

In the context of a Rule 12(b)(6) motion to dismiss the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citing

---

[12] At the end of the opposition the plaintiffs included a single-sentence request for leave to amend such that leave is sought to amend should it be necessary. (Rec. Doc. 23, Opposition at 39). The Court reiterates that the plaintiffs' complaint comprises 37 pages with 149 paragraphs and 89 footnotes that details events that date back as far as 2009. The Court cannot imagine what else the plaintiffs could possibly allege regarding the interactions with Chase. The plaintiffs did not move to amend their complaint to cure the deficiencies raised in the motion to dismiss.

*Tellabs, Inc. v. Makor Issues & Rights*, Ltd., 551 U.S. 308 (2007); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Lovick v. Ritemoney, Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004)). However, the foregoing tenet is inapplicable to legal conclusions. *Iqbal*, 129 S. Ct. at 1949. Thread-bare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550, U.S. 544, 555 (2007)). Any ambiguities in the current controlling substantive law must be resolved in the plaintiff's favor. *Lewis v. Fresne*, 252 F.3d 352, 357 (5th Cir. 2001) (citing *Burchett v. Cargill, Inc.,* 48 F.3d 173, 176 (5th Cir.1995)).

### Count I—RESPA, TILA, FDCPA

The first count of the plaintiffs' complaint raises claims under the RESPA, the TILA, and the FDCPA, which are three broad federal statutes. Chase argues that the plaintiffs cannot satisfy the legal requirements for asserting a claim under any of the statutes. Fannie Mae contends that the claims against it should be summarily dismissed because that entity is scarcely mentioned, and no conduct or actions on the part of that entity are alleged.

### RESPA—the Real Estate Settlement Procedures Act

The plaintiffs' RESPA claim of Count I pertains to the three inquiries, referred to as QWR1, QWR2, and QWR3, that Thomas sent to Chase. (Complaint ¶¶ 47-61). The RESPA claim is brought under § 2605(e), which pertains specifically to loan servicers. Specifically, the RESPA requires a servicer of a federally related mortgage loan to respond to any "qualified written request from the borrower (or an agent of the borrower)

for information relating to the servicing of such loan." 12 U.S.C. § 2605(e)(1)(A).[13]

A "qualified written request" shall be a written correspondence . . . that--

**(i)** includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

**(ii)** includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C.A. § 2605(e)(1)(B).

"Qualified written request" means a written correspondence from the borrower to the servicer that includes, or otherwise enables the servicer to identify, the name and account of the borrower, and either:

(1) States the reasons the borrower believes the account is in error; or

(2) Provides sufficient detail to the servicer regarding information relating to the servicing of the mortgage loan sought by the borrower.

12 C.F.R. § 1024.31.

Not later than 30 days after receipt from the borrower of a qualified written request, loan servicer shall—

**(A)** make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);

**(B)** after conducting an investigation, provide the borrower with a written explanation or clarification that includes--

**(i)** to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and

---

[13] Besides the fact that the plaintiffs allege no conduct on the part of Fannie Mae related to their QWRs (the QWR communications were only with Chase), Fannie Mae was never the loan servicer. Fannie Mae is therefore correct insofar as it contends that the RESPA claims against it must be summarily dismissed.

**(ii)** the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

**(C)** after conducting an investigation, provide the borrower with a written explanation or clarification that includes--

**(i)** information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and

**(ii)** the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

12 U.S.C. § 2605(e)(2).

Failure to comply renders the loan servicer liable to the borrower for actual damages to the borrower as a result of the failure; and in the case of a pattern or practice of noncompliance, additional damages, as the court may allow, in an amount not to exceed $2,000. *Id.* § 2605(f)(1)(A),(B).

Chase disputes the threshold requirement under the statute of whether any of QWR1, QWR2, or QWR3 actually constituted a "qualified written request" for purposes of liability under § 2605(e). And if any of QWR1, QWR2, or QWR3 did satisfy the requirements for a qualified written request under the RESPA, then Chase's position is that the responses that Chase provided were compliant with the requirements of § 2605 as a matter of law, such that no violation of the RESPA occurred.[14] And to the extent that

---

[14] QWR1, QWR2, and QWR3 and the responses for each are attached to and form part of the plaintiffs' complaint. (Exhibits 18, 19, and 20). Therefore, assuming that any of QWR1, QWR2, or QWR3 constitute a qualified written request, the Court can determine on the pleadings and at the Rule 12(b)(6) dismissal stage, if Chase's responses are compliant with the RESPA as a matter of law.

a violation of the RESPA did occur based on Chase's responses to QWR1, QWR2, and QWR3, Chase argues that the plaintiffs have failed to adequately allege actual damages arising out of any such violation, much less additional statutory damages.[15]

Chase's argument as to why none of QWR1, QWR2, or QWR3 constituted a valid qualified written request for purposes of the RESPA is that the requests are far too broad and impermissibly sweeping, more closely resembling litigation-style discovery requests rather than the type of borrower inquiries protected by the RESPA. Chase contends that the requests seek massive amounts of information that far exceed the scope of the RESPA, and simply border on constituting abusive tactics. Chase's position is that the plaintiffs have abused the RESPA's qualified written request protections by inundating Chase with gargantuan sets of inquiries and error assignments, then suing for RESPA

---

[15] In their opposition, the plaintiffs spent an inordinate amount of time focusing on the legal questions surrounding the issue of damages, *i.e.*, whether emotional distress damages are recoverable under RESPA and whether a pattern or practice of noncompliance can be demonstrated through the servicer's dealings with the plaintiff alone. But the plaintiffs spent little effort addressing *their* alleged damages, which Chase challenged in its motion to dismiss. Of course issues pertaining to damages, whether legal or factual in nature, only become important if Chase's response to any qualified written request was non-RESPA compliant. Importantly, the standard for RESPA compliance is not satisfaction on the part of the borrower but rather specifically what § 2605(e)(2) mandates, which is not that difficult of a threshold to meet. The plaintiffs ignored this issue of law in their opposition.

Furthermore, each of QWR1, QWR2, and QWR3 has numerous and multiple parts (and some subparts) arguably constituting several *individual* qualified written requests and the plaintiffs implicitly recognize this when they accuse Chase of failing to adequately respond to no less than thirty (30) different qualified written requests. (Rec. Doc. 23, Opposition at 12). For *each* of those qualified written requests the plaintiffs must establish actual damages traceable *to that particular request*. The plaintiffs have not pleaded any connection between any actual damages and any specific QWR. It is insufficient that their dealings with Chase as a whole over the last four years have caused them mental distress.

violations when the responses did not satisfy them.[16]

Chase has cited a plethora of district court cases recognizing that onerous and overly broad borrower requests, including those seeking an entire loan file, do not constitute a valid qualified written request for purposes of imposing liability against a loan servicer under the RESPA, (Rec. Doc. 19-1, Memorandum in Support at 7 n.10), for which the plaintiffs had no response. The plaintiffs have the burden of establishing that each of the documents (or individual items) that they sent to Chase constituted a qualified written request under the RESPA, and that the response received violated the RESPA's requirements.[17]

**QWR1**—Thomas sent QWR1 to Chase on November 8, 2022 via its messaging portal. The correspondence does not identify any suspected errors with the loan but rather seeks information only. QWR1 asks for ten comprehensive categories of information and associated documentation spanning the entire 16-year history of the

---

[16] For example, QWR2 asked for 14 categories of information and documents with 16 subparts, along with a notice of error imbedded within the requests for information. QWR3 comprises a series of four letters, the first of which asked for five categories of information, the second of which was a massive 45-item combination error notice/information request, including an item requesting the entire bank file.

[17] Naturally the Court has reviewed the requests in conjunction with the motion to dismiss and it cannot be said that Chase is overstating the sweeping, massive nature of the requests that the plaintiffs seek to hold Chase liable for under the RESPA. The federal regulations include provisions in 12 C.F.R. § 1024.35(g)(1)(ii) and § 1024.36(f)(1)(iv), which allow a loan servicer to notify the borrower that the request is considered overbroad or unduly burdensome but Chase did not invoke those provisions opting instead to attempt to respond to the requests. The Court is not persuaded that the loan servicer's failure to invoke the provisions in 12 C.F.R. § 1024.35(g)(1)(ii) and § 1024.36(f)(1)(iv) when the request is first received forecloses the servicer's ability to raise the issue of overbreadth or burdensomeness later in subsequent litigation.

loan, something that Chase describes as a massive amount of information and documentation.[18]

Chase sent responses to QWR1 as follows: November 8, 2022 (two that day), November 10, 2022, December 16, 2022, and December 19, 2022 (two that day). (Exhibit 18).

The Court is persuaded that as a matter of law Chase's responses to QWR1 trigger no liability under the RESPA. Neither the complaint nor the plaintiffs' opposition identifies where Chase's responses (which were significant) to the 10 parts of QWR1 fell short of the duty to respond imposed by the RESPA. The plaintiffs simply alleged that the 38-page payment history provided by Chase (found at Exhibit 3 to the complaint) was not complete but they do not explain why it was incomplete. And even if it was incomplete, that would not ipso facto mean that the RESPA was violated. The Court is persuaded that as a matter of law Chase's response to QWR1 satisfied the requirements imposed by the RESPA.[19]

_____

[18] The Court notes that Item # 8 of QWR1, which is "[a] copy of the appraisal," is not an information request pertaining to the servicing of the loan and therefore triggered no duty to respond under the RESPA. But Chase did respond to that request.

[19] If Chase's response to QWR1 was not RESPA compliant then it would only have been so with respect to the Item # 1 "complete payment history," which the plaintiffs summarily state was not complete and which was the only aspect of the response that the plaintiffs challenged. The plaintiffs fail to allege any damages traceable to that particular alleged violation.

Chase raises another point with respect to QWR1. The implementing federal regulations for the RESPA are known as "Regulation X." 12 C.F.R. § 1024.1. For qualified written requests, the regulations allow the servicer to establish an address that the borrower must use when either requesting information or notifying the servicer of an error. 12 C.F.R. § 1024.35(c) (notice of error); 12 C.F.R. § 1024.36(b) (information request). It is undisputed

**QWR2—**QWR2 was sent to Chase on January 24, 2023. The five-page document referred to as QWR2 contained the following statement: "You have grossly misapplied our payments, mismanaged our escrow account, unlawfully collected payments, interests [sic], and fees not owed, manipulated the numbers and statements, and engage [sic] in unfair and deceptive practices." (Rec. Doc. 1-20, Exhibit 20 at 1). This statement is not a request for information but rather purports to be a notice of error. The remainder of the QWR2 seeks an extensive array of information in 14 items (some items have subparts—16 subparts according to Chase) many of which call for narrative answers to questions.

Chase sent four responses to QWR2 as follows: February 21, 2023, March 6, 2023, March 23, 2023, and March 30, 2023. (Exhibit 19).

The Court is inclined to agree with Chase's contention that the quoted error statement—which refers to at least five different areas where an error could have occurred over the course of what was then a nearly fifteen year old loan—is simply too broad to constitute a notice of error under the RESPA.[20] But to the extent that the

---

that Chase had established such an address, and that Thomas did not send QWR1 to that designated address but rather to the Chase messaging portal. Chase did not object at the time of receipt but instead attempted to respond to QWR1. But Chase now argues that it had no duty to respond and that QWR1 is not covered by the RESPA because the plaintiffs did not send the request to the proper designated address.

The Court notes that nothing in the RESPA or Regulation X suggests that the duty to respond does not trigger if an otherwise valid qualified written request arrives via a means other than the designated address and the servicer elects to accept it, which Chase clearly did.

[20] The Court says this because the quoted statement does not provide any specificity regarding any specific error. Both the applicable statute and the accompanying federal

statement did constitute a valid notice of error, the response that Chase sent to the plaintiffs on March 6, 2023, in which Chase states that it reviewed the loan and confirmed that there was no error complied, with both 12 U.S.C. § 2605 (e)(2) and 12 C.F.R. § 1024.35. Chase advised that it investigated, found no error, provided its reasons, and a follow-up telephone number. RESPA required no more. The same holds true for Chase's responses to the multi-part extensive information request contained in QWR2. (Exhibit 19 at 6-16). The Court is persuaded that as a matter of law Chase's responses to QWR2, assuming that QWR2 even constituted a qualified written request, satisfied the requirements imposed by the RESPA.

QWR3—The documents collectively referred to as QWR3 were sent to Chase beginning on August 22, 2023.[21] The first of the four letters (Exhibit 20 at 2) constituting QWR3 asked for five categories of information regarding the transfer of the loan to Fannie Mae. The second letter (Exhibit 20 at 3) was designated as both a notice of error and a request for information under the RESPA and this five page letter contained 45 items with the last being a request for "the entire bank file." (*Id.* at 7). The third letter (Exhibit 20 at 22) dated August 28, 2023, was a request from Thomas to Chase advising his preferences for the format of Chase's responses. That same date Thomas sent a

_____

regulation require sufficient detail for the servicer to investigate the alleged error.

[21] QWR3 followed a letter from Chase's counsel to Thomas dated August 9, 2023, in which counsel explained that he had reviewed the bank's entire file relating to the loan to determine whether any balance on the principal remained due. (Exhibit 20 at 8). That letter provides a clear and detailed explanation as to why Chase maintains that $15,706.22 remained outstanding on the loan as of August 9, 2023. Counsel sent the payment history detailing the various payments to Thomas with the letter.

fourth letter to Chase (Exhibit 20 at 23), again designated as both a notice of error and a request for information under the RESPA, that included six additional categories of information.

Chase responded on October 6, 2023. (Exhibit 20 at 26-35). Chase advised that it had reviewed Thomas's loan and confirmed that there was no error. (*Id.* at 26). Chase went on to explain at length why it took the position that there was no error. Chase then provided information to respond to the numerous inquiries submitted in the letters.

As with the other QWRs, the plaintiffs do not dispute the response to any of the specific line items contained in the QWR3 documents except as to item # 45, which is the entire loan file, and the inquiry regarding loan ownership information (Complaint ¶ 88), which is statutorily mandated, 12 U.S.C. § 2605(k)(1)(D).[22]

Chase's response acknowledges that "[y]ou also requested a copy of your servicing file, which we'll send in a separate letter." (Exhibit 20 at 27). Apparently the entire file was not sent to the plaintiffs.[23]

Chase argues that the request for the entire loan file did not trigger a duty to respond under the RESPA because such a request is overbroad. Chase cites non-

---

[22] With respect to QWR3, which again comprises several letters one of which contains 45 items by itself, it is insufficient for the plaintiffs to simply state that "thirty or so" of the responses were either non-responses or deficient without identifying the specific items that were non-compliant, why they were non-compliant, and how the plaintiffs were damaged as a result. (Rec. Doc. 23, Opposition at 7).

[23] The plaintiffs contend that representatives of Chase including its defense counsel promised to deliver the entire mortgage servicing file but then reneged, which was one of the reasons that the plaintiffs filed this lawsuit. (Opposition at 7).

controlling decisions where other courts have decided that overbroad requests do not trigger an obligation to respond under the RESPA, in other words, they do not subject the servicer to liability under the RESPA. (Memorandum in Support at 10 n.10).

The Court declines to grant the Rule 12(b)(6) motion to dismiss based on the contention that as a matter of law the overbroad nature of the loan file request—and to be sure the request may very well be overbroad and burdensome—removes it from the scope of the RESPA on that basis alone. The RESPA definition of a qualified written request seeking information from the loan servicer requires only written correspondence with proper identifying information that provides sufficient detail to the servicer regarding the information sought by the borrower. 12 U.S.C. § 2605(e)(1)(B). All of these simple and straight forward requirements were met by the item in QWR3 that sought the entire bank file. Chase not only declined to invoke the provisions of the federal regulations to advise that the request was considered overbroad and burdensome (see footnote 17 above) but instead affirmatively agreed to produce the file on more than one occasion only to later refuse to do so. The Court notes that in the very first district court decision cited by Chase, *Friess v. Shellpoint Mortgage Servicing*, No. 21-8101, 2022 WL 742728, at *4 (D. Ariz. Mar. 11, 2022), the servicer had in fact provided the required notice to the borrower. And in *McCoy v. Wells Fargo Bank, N.A.*, No. 20-176, 2021 WL 4451423 (D. Or. July 21, 2021), the primary basis for the court finding that the RESPA did not apply was that the request did not relate to loan "servicing."

Of course, Chase is correct in pointing out that the plaintiffs have alleged no

damages traceable to the specific failure by Chase to respond to QWR3 item 45 which was a request for the entire bank file. While the Court questions that the plaintiffs can ultimately satisfy the RESPA's requirements, including proof of damages related to the QWR3 item 45, the Court nonetheless is persuaded that the claim should not be adjudicated *on the pleadings*. Chase remains free to challenge the RESPA claim pertaining to QWR3 item 45 in a subsequent dispositive motion.

Insofar as Chase is concerned, the motion to dismiss is GRANTED as to all of the RESPA claims except the one pertaining to QWR3 item 45, which was the request for the entirety of the loan servicing file.[24] Insofar as Fannie Mae is concerned, the motion to dismiss is GRANTED as to all of the RESPA claims against this defendant.

### TILA—Truth in Lending Act

The plaintiffs' TILA act claim is grounded on the allegation that throughout the life of the loan, which originated in March 2008, Chase failed to promptly apply their payments in violation of "the pertinent TILA provisions," which the plaintiffs have not cited.[25] For the TILA cause of action the complaint cites only to federal regulation 12

---

[24] Item 45 is actually called "the entire bank file," but RESPA only covers loan servicing so the request can only validly be interpreted in the context of a RESPA claim as "the entire loan servicing file."

The Court is inclined to believe that at this juncture Chase should simply comply with the request, which apparently it had previously indicated that it would do, and produce the file to the plaintiffs so that they can either convince themselves that the loan is not paid off as Chase contends or determine that the loan is paid off and where Chase erred in concluding to the contrary.

[25] Chase legitimately complains that the plaintiffs' failure to cite the specific TILA provision upon which they rely or the subpart of Regulation Z that they believe is applicable to their case, is insufficient to put Chase on notice as to the nature of the claim. (Memorandum in

C.F.R. § 1026.36, referred to as Regulation Z. (Complaint ¶ 89). "Regulation Z means

the regulations issued by the Bureau (12 CFR part 1026) to implement the Federal Truth

in Lending Act (15 U.S.C. 1601 et seq.), and includes the Commentary on Regulation Z."

12 C.F.R. § 1024.2

Section 1639f of Title 15, entitled Requirements for Prompt Crediting of Home

Loan Payments, provides:

> **(a) In general**
> In connection with a consumer credit transaction secured by a
> consumer's principal dwelling, no servicer shall fail to credit a payment to
> the consumer's loan account as of the date of receipt, except when a delay
> in crediting does not result in any charge to the consumer or in the
> reporting of negative information to a consumer reporting agency, except
> as required in subsection (b).
>
> **(b) Exception**
> If a servicer specifies in writing requirements for the consumer to
> follow in making payments, but accepts a payment that does not conform
> to the requirements, the servicer shall credit the payment as of 5 days after
> receipt.

15 U.S.C. § 1639f.

Chase takes issue with the fact that the plaintiffs simply incorporated the first 83

paragraphs of their complaint into the TILA section of Count I without identifying which

specific payments that they believe violated the TILA. And this is important because

where the plaintiffs do specifically allege the failure to properly credit payments, some of

those payments go back to the year 2009. TILA claims are governed by a one-year

---

Support at 14). Chase therefore reasonably surmised that the TILA claim is supposed to be
based on 15 U.S.C. § 1639f, which the plaintiffs did confirm in their opposition. (Opposition
at 12).

statute of limitations, *Williams v. Countrywide Home Loans, Inc.*, 504 F. Supp. 2d 176, 186 (S.D. Tex. 2007), *aff'd,* 269 F. App'x 523 (5th Cir. 2008) (citing 15 U.S.C. § 1640(e)).

Chase points out that this lawsuit was filed on February 28, 2024, yet the complaint fails to allege any misapplied *periodic* payments within the year preceding the filing of this lawsuit. The Court emphasizes the qualifier *periodic* because Chase argues that the scope of § 1639f is limited to periodic loan payments because the implementing part of Regulation Z so states. Chase points out that much of what the plaintiffs are complaining about is the failure to credit payments of *additional* principal not periodic principal payments and therefore should not be cognizable under § 1639f.[26]

Chase is correct insofar as the plaintiffs have not identified any payment, whether periodic or additional, that was made and not properly credited pursuant to the TILA within one year of this lawsuit being filed. In their opposition, the plaintiffs refer to "numerous periodic payments," and direct the Court to paragraph 34 of the complaint, which again vaguely refers to "*numerous* instances where payments were made but never applied," without identifying when those transactions occurred.

The plaintiffs have not established that equitable tolling of the one-year limitations period should apply for any payments outside of the year leading up to the lawsuit being

---

[26] The statute itself does not expressly limit the application of § 1639f to periodic payments only. And the Court is not persuaded that Regulation Z purports to foreclose application to additional payments via 12 C.F.R. § 1026.36(c)(1)(i) simply because the regulation specifically refers to periodic payments. The Court assumes that the regulation mentions only periodic payments because § 1639f(a) excepts the situation when a delay in crediting does not result in a charge to the consumer or in the reporting of negative information to a consumer reporting agency. And of course the payment of additional principal implicates neither of these concerns.

filed. When the plaintiffs raised this argument in their opposition they mentioned only the payments from 2009, yet as Chase has pointed out there are no acts of concealment alleged within a year of those transactions. The plaintiffs stated generally and in conclusory fashion that Chase has engaged in concealment, misrepresentation, and fraud without expounding upon when this occurred vis à vis any of the facially time-barred transactions. Therefore, the plaintiffs have not met their burden as to equitable tolling.

The motion to dismiss is GRANTED as to the TILA claim.[27]

**FDCPA—Fair Debt Collection Practices Act**

The plaintiffs' FDCPA claim is grounded on the allegation that throughout 2023 Chase falsely represented the character, amount, and legal status of the loan balance in violation of 15 U.S.C. § 1692e(2)(A). (Complaint ¶ 90). This allegation is based on the contention that Chase previously informed the plaintiffs that the loan was paid off and then later retracted that statement through its defense counsel.[28] (*Id.*).

---

[27] The plaintiffs allege no conduct whatsoever on the part of Fannie Mae related to the failure to properly credit payments. Fannie Mae is therefore correct insofar as it contends that the TILA claims against it must be summarily dismissed.

[28] As the Court noted in footnote 7 above, it is not clear what the plaintiffs' position is as to when the loan was actually paid off. It appears that the plaintiffs believe that given all of the extra payments that they made toward principal that the loan must be paid off, and they point to the January 11, 2023 communication from "Lux" as proof of that belief. Meanwhile, it is the Court's understanding that the plaintiffs' tenacity in attempting to obtain the entire loan servicing file from Chase is so that they can find something in the records that establishes that the loan was paid off.

The Court has already questioned the interpretation that the plaintiffs are giving to the communication from "Lux," see footnote 7, *supra*, which given the several communications from Chase representatives that contained incorrect or erroneous information, the plaintiffs

Section 1692e, entitled False or Misleading Representations, provides in relevant part, that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. The false representation of "the character, amount, or legal status of any debt," constitutes a violation of § 1692e. *Id.* § 1692e(2)(A).

Chase argues that § 1692e(2)(A) does not apply to it because of the express exception found in § 1692a(6) such that the term "debt collector" does not include—

> [A]ny person collecting or attempting to collect any debt owed or due or asserted to be owed **or due another** to the extent such activity (i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; **(ii) concerns a debt which was originated by such person**; **(iii) concerns a debt which was not in default at the time it was obtained by such person**; or (iv) concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.

15 U.S.C.A. § 1692a(6)(F) (emphasis added).

Thomas obtained the loan from Chase on March 24, 2008, and Chase sold the loan to Fannie Mae on May 1, 2008. (Complaint ¶ 1). Chase remained the loan servicer. (*Id.* ¶ 5). It is undisputed that the loan originated with Chase and that the debt was not in default on May 1, 2008, when it was sold to Fannie Mae. Chase argues therefore that under the express exception recognized in § 1692a(6)(F) above, it is a mortgage loan servicer that attempted to collect a debt owed by the plaintiffs which "originated" with it, a debt that was not in default when sold, and the FDCPA does not apply to Chase in this

---

oddly assume must be correct.

circumstance. Chase points to *Perry v. Stewart Title Co.*, 756 F.2d 1197 (5th Cir. 1985), which it contends is directly on point.

In *Perry*, the original lender had sold the plaintiffs' home loan to the Federal National Mortgage Association (FNMA) but continued to service the loan for FNMA. 756 F.2d at 1202. When the plaintiffs sued both the original lender/servicer and the FNMA under the FDCPA, the Fifth Circuit applied the exception to the term "debt collector" found in 15 U.S.C.A. § 1692a(6)(F) and held that neither the original lender/servicer nor the FNMA could be liable under the Act. The term debt collector does not apply to a mortgage servicing company or to the bona fide assignee of a debt so long as it was not in default when it was assigned. *Id.* at 1208.

It is clear then in this case that neither Chase as the loan servicer nor Fannie Mae as the assignee of a debt that was not in default, is a "debt collector" under the FDCPA. Moreover, the plaintiffs allege no conduct whatsoever on the part of Fannie Mae that could possibly implicate a FDCPA claim.

The motion to dismiss is GRANTED as to the FDCPA claim.

**Count II—RICO**

The plaintiffs' RICO claim is grounded on the allegation that Chase and Fannie Mae constitute a RICO "enterprise" that has conducted its affairs by committing mail fraud, wire fraud, bank fraud, and money laundering—all federal criminal offenses—constituting a "pattern of racketeering activity," in violation of 18 U.S.C. § 1962(c) and that they conspired to do so in violation of 18 U.S.C. § 1962(d). The RICO count is based

on all of the allegations contained in the complaint (¶¶ 1-102). The plaintiffs allege that by nonapplication and misapplication of payments, thereby allowing the enterprise to collect unearned principal, interest, and fees, Chase and Fannie Mae have conducted a criminal enterprise that has caused them actual damages of $101,400.63.[29] (Rec. Doc. 12, RICO Case Statement ¶ 17).

The defendants argue that the plaintiffs have failed to plead facts supporting the existence of a RICO enterprise, or facts that demonstrate that the alleged enterprise existed separate and apart from the alleged pattern of racketeering activity, and that the plaintiffs have not alleged facts showing continuity.

By its terms, RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." *D&T Partners, L.L.C. v. Baymark Partners Mgmt., L.L.C.*, 98 F.4th 198, 204 (5th Cir. 2024) (citing 18 U.S.C. § 1962(c)). All RICO claims share three common elements: "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise." *Id.* (quoting *Braham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007)). The import of the term "pattern" is that the plaintiff must establish the "threat of continuing activity," or continuity. *Id.* (quoting

---

[29] The allegations in the complaint provide no insight as to how the plaintiffs derived this number.

*Malvino v. Delluniversita*, 840 F.3d 223, 231 (5th Cir. 2016)). In other words, "continuing racketeering activity." *Id.* at 205. The framework developed in the jurisprudence is that the plaintiff can demonstrate continuity by alleging "a closed period of repeated conduct," (closed continuity), or past conduct that by its nature projects into the future with a threat of repetition," (open-ended continuity). *Id.* (citing *H.J., Inc. v. Northwestern Bell Tel Co.*, 492 U.S. 229, 241 (1989)).

The principle of continuity is essential to alleging a RICO violation because RICO was not intended to extend to fraudulent commercial transactions affecting interstate commerce. *Delta Truck Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 242 (5th Cir. 1988). Thus, continuity is a "critical feature" of a "pattern of racketeering activity." *Id.* at 243 (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985)).

A party can demonstrate closed continuity by alleging a series of related criminal acts extending over a substantial period of time. *D&T Partners*, 98 F.4th at 205. But duration is not a dispositive factor; courts also consider the number of victims injured by the alleged racketeering acts as well as the number of schemes allegedly involved. *Id.* (citing *Abraham v. Singh*, 480 F.3d 351, 356 (5th Cir. 2007); *H.J., Inc.*, 492 U.S. at 237). Courts have stressed that "a single scheme to accomplish 'one discreet goal,' directed at one individual with no potential to extend to other persons or entities" is not the type of racketeering "pattern" that RICO seeks to prohibit. *D&T Partners*, 98 F.4th at 207 (quoting *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1516 (10th Cir.1990)).

The law is clear insofar as the commission of predicate criminal acts alone does

not establish a RICO violation. Ignoring that the plaintiffs' allegations do not suffice to establish any requisite criminal acts on the part of Chase or Fannie Mae,[30] but assuming that any such acts occurred over a substantial period of time, the plaintiffs' allegations nonetheless fail on the continuity requirement for a pattern of racketeering activity. This case involves a single alleged "scheme" with one discrete goal directed only at the plaintiffs. The entire "scheme" concludes once the plaintiffs' loan balance is paid off, which the plaintiffs contend has already occurred, as does the enterprise that allegedly formed to execute the scheme. If the contractual relationship between Chase and Fannie Mae constituted a RICO enterprise, which is a proposition bordering on the absurd, the enterprise does not pose a continuous threat of criminal activity. The confection of the home loan secured by the plaintiffs' dwelling was a lawful discrete transaction, and even if the predicate acts alleged occurred in the servicing of the loan, the entire enterprise reaches its logical conclusion when the loan is paid off.

In sum, the allegations do not support a substantive RICO violation nor a

---

[30] Under the pleading principles explained in *Ashcroft v. Iqbal, supra*, the allegations are insufficient to establish that any predicate criminal acts occurred to support a RICO claim. The criminal acts relied upon for the RICO count are mail fraud, wire fraud, bank fraud, and money laundering. 18 U.S.C. §§ 1341, 1343, 1344, 1956, 1957. Both mail fraud and wire fraud share the specific intent to defraud as an element of the crime but the plaintiffs do not allege facts that take this case beyond anything other than potentially incorrect or erroneous information being sent by mail or electronic submission. The allegations do not plausibly suggest that any criminal conduct occurred.

Further, the reliance on § 1956, which is the laundering of monetary instruments, and § 1957, which is engaging in monetary transactions in property derived from specified unlawful activity, is particularly frivolous, as is the reliance on the bank fraud statute, 18 U.S.C. § 1344. Section 1344 casts the bank as the victim of the crime, not the perpetrator of the crime as the plaintiffs are attempting to do.

conspiracy to commit a substantive RICO violation.

The plaintiffs' RICO claim grounded on a violation of 18 U.S.C. § 1962(c) is DISMISSED. The plaintiffs' claim for a RICO conspiracy in violation of 18 U.S.C. § 1962(d) is likewise DISMISSED.

### Count III—LRA

The plaintiffs have included a claim under Louisiana's Racketeering Act (LRA), La. R.S. § 15:1351, *et seq.*, which has been the subject of limited jurisprudence. *State v. Davenport*, 316 So. 2d 888, 903 (La. App. 4th Cir. 2017). Thus, courts in Louisiana look to federal jurisprudence interpreting RICO for guidance in interpreting the Louisiana counterpart. *Id.*

For the reasons explained with respect to the federal RICO claim, the plaintiffs' claim under the LRA likewise fails. The plaintiffs' contention that the LRA makes available a wider array of potential predicate acts, and has a provision dealing with the unlawful acquisition of immovable property, do not alter the absence of factual allegations to establish the necessary continuity for a RICO claim.

The plaintiffs' LRA claim is DISMISSED.

### Count IV—ANNULMENT

Citing Louisiana Civil Code articles 1966 and 2030,[31] the plaintiffs seek to annul

---

[31] Louisiana Civil Code article 1966, entitled No Obligation without Cause, states that "[a]n obligation cannot exist without a lawful cause." Louisiana Civil Code article 2030, entitled Absolute Nullity of Contracts, states in relevant part that "[a] contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral. A contract that is absolutely null may not be confirmed."

the 2008 promissory note and mortgage instrument alleging that those agreements were executed for the purpose of an illicit cause and object and therefore stand against public policy. (Complaint ¶ 115). In support of this contention the plaintiffs allege that since the inception of the loan Chase has engaged in deceptive and abusive lending and mortgage servicing practices, repeatedly misappropriated their funds, and repeatedly misled and deceived them. (*Id.* ¶¶ 116-118).

The defendants characterize this claim as "preposterous," (Memorandum in Support at 39), because the unstated yet necessary underlying premise of the claim is that Chase provided a home loan to Thomas back in 2008, with Fannie Mae waiting in the wings to purchase the loan, in order to later engage in deceptive and abusive lending and mortgage servicing practices, repeatedly misappropriate their funds, and repeatedly mislead and deceive them.

The plaintiffs have alleged no facts to render the foregoing premise plausible. The motion to dismiss is GRANTED as to the state law annulment claim.

### Count V—BREACH OF CONTRACT

As in Count IV, the plaintiffs once again seek recission of the loan agreement and mortgage instrument, along with damages and attorneys fees, based on a breach of contract theory. Although the plaintiffs point to no specific contractual provision that Chase allegedly breached, and this deficiency is emphasized in the motion to dismiss, the plaintiffs' position is that Chase breached the duty of good faith and fair dealing implicit in all contracts when it failed to provide an accurate accounting of the loan

balance and repeatedly misappropriated their funds.

While it is correct that contracts must be performed in good faith, La. Civ. Code art. 1983, "good faith" is not an independent obligation that can support a breach of contract claim when the obligee can point to no other provision of the contract that has been breached. *See Favrot v. Favrot*, 68 So. 3d 1099, 1107 (La. App. 4 Cir. 2011); *Ledet v. Campo*, 128 So. 3d 1034, 1040 (La. App. 3d Cir. 2013). The plaintiffs point to no specific contractual provision that Chase allegedly breached.

The motion to dismiss is GRANTED as to the state law breach of contract claim.

### Count VI—FRAUD

The fraud claim is brought against Chase alone. The plaintiffs allege that Chase has engaged in fraud by repeatedly failing to apply (or affirmatively misapplying) their loan payments, and by producing false and misleading bank statements, and by failing to disclose all requested information and instead producing incomplete information. (Complaint ¶¶ 132-134).

Under Louisiana law, "[f]raud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." La. Civ. Code art. 1953. Fraudulent intent, or the specific intent to deceive, is a necessary and inherent element of fraud. *Lomont v. Bennett*, 172 So. 3d 620, 634 (La. 2015); *Terrebonne Concrete, LLC v. CEC Enterprises, LLC*, 76 So. 3d 502, 509 (La. App. 1st Cir. 2011) (citing *Whitehead v. Am. Coachworks, Inc.,* 837 So.2d 678, 682 (La. App. 1st

Cir.2002)). Fraud cannot be predicated upon mistake or negligence, no matter how gross. *Terrebonne Concrete, LLC*, 76 So. 3d at 509.

When alleging fraud, a party must state with particularity the circumstances constituting fraud. Fed. R. Civ. Pro. 9(b). Conditions of a person's mind may be alleged generally. *Id.* The particularity demanded by Rule 9(b) necessarily differs with the facts of each case. *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067–68 (5th Cir. 1994) (citing *Guidry v. Bank of LaPlace,* 954 F.2d 278, 288 (5th Cir. 1992)). Rule 9(b) requires the plaintiff to allege "the particulars of 'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'" *Id.* (quoting *Tel–Phonic Services, Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1139 (5th Cir.1992)). Though the second sentence of Rule 9(b) relaxes the particularity requirement for conditions of the mind, case law amply demonstrates that pleading scienter requires more than a simple allegation that the defendant had fraudulent intent. *Id.* at 1068.

Chase argues that the plaintiffs have not come close to satisfying the particularity pleading requirement of Rule 9(b). Chase complains that the plaintiffs have made no attempt to segregate their factual allegations to identify any specific conduct alleged to be fraudulent instead engaging in "an interlocking series of incorporation paragraphs."[32]

---

[32] The Count VI fraud cause of action purports to rely on the allegations contained in paragraphs 121 through 128 of the complaint, which then incorporate by reference paragraphs 114-120, which then incorporate by reference paragraphs 103-113, which then incorporate by reference paragraphs 92-102, which then incorporate by reference paragraphs 84-91, which then incorporate by reference paragraphs 1-83. Thus, the fraud

(Memorandum in Support at 40). Chase argues that as a matter of law, the plaintiffs have no claim for fraud based on the failure to speak because no such duty was owed under Louisiana law. As to fraud by affirmative acts, Chase argues that at best what the plaintiffs have alleged is that Chase supplied them with wrong or incorrect information but a bank does not commit fraud by mistakenly applying a customer's payments or by occasionally providing wrong information. And furthermore, Chase points out the plaintiffs have not alleged any reliance on Chase's allegedly fraudulent misrepresentations instead detailing how they repeatedly notified Chase of what they believe to be errors. Chase contends that absent the element of reliance, a plaintiff cannot state a claim for fraud.

For purposes of the Rule 12(b)(6) analysis, the Court accepts as true every aspect of the plaintiffs' complaint regarding the failure to properly credit payments of extra principal, the failure to properly manage the escrow account, the reporting of erroneous or incorrect information to the plaintiffs, whether by representatives of Chase through the internal messaging system or the online banking system. In fact, there seems to be little dispute by Chase insofar as mistakes and errors did occur in the servicing of Thomas's loan.

But mistakes and errors (even if they inured to the benefit of Chase as the plaintiffs allege), even gross ones, do not constitute fraud. The all-important

---

cause of action is based on every single allegation contained in the complaint, and many of those allegations constitute non-actionable instances of dissatisfaction with Chase's services.

distinguishing element that plausibly turns what could otherwise be characterized as mistakes and errors into fraud, is fraudulent intent, or the specific intent to deceive, which is a necessary and inherent element of fraud. Federal Rule 9(b) imposes a heightened pleading standard beyond the "short and plain statement" that normally suffices when pleading a claim, Fed. R. Civ. Pro. 8(a)(2), because merely characterizing certain conduct as "false," or "misleading," or "deceptive," without factual allegations to support the connotations intended, does not suffice to state a claim for fraud. The plaintiffs' complaint contains no factual allegations to support the inference of fraudulent intent, and certainly none pleaded with particularity.[33]

The motion to dismiss is GRANTED as to the state law fraud claim.

**Count VII—BREACH OF FIDUCIARY DUTY**

The breach of fiduciary duty claim is brought against Chase alone.

The plaintiffs allege that because Chase acted as an "escrow agent," it owed them a fiduciary duty, which it breached by mismanaging the escrow account. (Complaint ¶ 140).

Chase argues that the plaintiffs' breach of fiduciary duty claim fails because under Louisiana law a financial institution is not a customer's fiduciary. In support of this argument Chase cites La. R.S. § 6:1124, entitled No Implied Fiduciary Obligations, which states:

---

[33] When a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of "entitlement to relief." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).

> No financial institution or officer or employee thereof shall be deemed or implied to be acting as a fiduciary, or have a fiduciary obligation or responsibility to its customers or to third parties other than shareholders of the institution, ***unless there is a written agency or trust agreement under which the financial institution specifically agrees to act and perform in the capacity of a fiduciary.*** The fiduciary responsibility and liability of a financial institution or any officer or employee thereof shall be limited solely to performance under such a contract and shall not extend beyond the scope thereof. Any claim for breach of a fiduciary responsibility of a financial institution or any officer or employee thereof may only be asserted within one year of the first occurrence thereof. This Section is not limited to credit agreements and shall apply to all types of relationships to which a financial institution may be a party.

La. R.S. § 6:1124 (emphasis added).

It is undisputed that there is no written agreement wherein Chase agreed to act as fiduciary for the plaintiffs.

The plaintiffs cite to Regulation X as the source of the fiduciary duty underlying their claim but Regulation X does not impose or create a fiduciary relationship for purposes of a claim under state law. Louisiana law controls and none of the district court cases cited in the plaintiffs' memorandum in opposition are brought under Louisiana law.

The motion to dismiss is GRANTED as to the state law breach of fiduciary duty claim.[34]

### Count VIII—UNJUST ENRICHMENT

Chase argues that the plaintiffs' unjust enrichment claim must be dismissed

---

[34] Chase also raised the issue of timeliness pointing out that the last conduct that allegedly constituted a breach of fiduciary duty occurred in February 2021. This was three years before the plaintiffs filed their lawsuit, and Chase contends that a one-year limitations period applies. The plaintiffs did not respond to this contention.

because they have other remedies available at law—as demonstrated by the numerous other counts included in their complaint. Under Louisiana law,

> A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary **and shall not be available if the law provides another remedy for the impoverishment** or declares a contrary rule.

La. Civ. Code art. 2298 (emphasis added).

The unjust enrichment claim fails as a matter of law because an essential element of such a claim is that the plaintiff has no other remedy at law available. *Nine-O-Five Royal Apt. Hotel, Inc. v. Atkins*, 151 So. 3d 739, 755 n.25 (La. App. 4th Cir. 2014) (citing *United Enterprises Corp. v. Dixon Mortg. Group, Inc.*, 762 So. 2d 43, 47 (La. App. 4th Cir. 2000)). The plaintiffs have other remedies available at law and they have asserted those in their complaint. That they might not be successful in pursuing those other available remedies matters not to whether the unjust enrichment claim is viable. *Walters v. MedSouth Rec. Mgt., LLC*, 38 So. 3d 243, 244 (La. 2010).

The motion to dismiss is GRANTED as to the state law unjust enrichment claim.[35]

**Count IX—INJUNCTIVE RELIEF**

Via Count IX of the complaint the plaintiffs seek the entire mortgage servicing file

---

[35] Assuming that the plaintiffs do obtain a copy of the entire loan servicing file, and if it turns out that the errors and mistakes that Chase made in properly applying their payments resulted in them paying money not owed, unjust enrichment may be the only cause of action available to the plaintiffs to recover those funds, and therefore leave to amend at that juncture may be considered.

and documents from Fannie Mae pertaining to ownership of the loan, including all of the communications and transactions between Chase and Fannie Mae. The injunctive relief sought is just that—relief—and it must be tethered to a cause of action for which that form of relief is appropriate.

The motion to dismiss is GRANTED as to Count IX insofar as the request for the mortgage servicing file and documents from Fannie Mae pertaining to ownership of the loan, including all of the communications and transactions between Chase and Fannie Mae, has been pleaded as a standalone cause of action, which is not appropriate.[36]

## III.   Conclusion

The motion to dismiss filed by the defendants, Chase and Fannie Mae, is granted in part and denied in part. The motion is granted as to Fannie Mae in its entirety and all claims against this defendant are dismissed with prejudice. The motion is granted as to Chase as to all claims except for the Count I RESPA claim pertaining to QWR3 item 45, which was the request for the entirety of the loan servicing file.

Accordingly, and for the foregoing reasons;

---

[36] The plaintiffs did not allude to Rule 65 in their complaint although it crept into their opposition with respect to Count IX. (Memorandum in Opposition at 38). The Court agrees with Chase's position that the allegations in the complaint do not satisfy the Rule 65 factors for obtaining an injunction in this case.

Again, the Court urges Chase to simply produce the file.

**IT IS ORDERED** that the **Motion to Dismiss (Rec. Doc. 19)** filed by the

defendants, JPMorgan Chase Bank, N.A. and the Federal National Mortgage

Association, is **GRANTED IN PART AND DENIED IN PART** as explained above.

August 19, 2024

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE